## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| OUT OF NOWHERE, a California Corporation, doing business as OCEANS WEST; and STEVEN BELL, an Individual,<br><br>        Plaintiffs,<br><br>v.<br><br>NOLAN TRANSPORTATION GROUP, LLC, a Delaware Limited Liability Company; MARK SMITH, an Individual; LEE WASSERMAN, an Individual; and, DOES 1-10, inclusive,<br><br>        Defendants. | Civil Action No.<br>1:23-cv-00041-VMC |

### OPINION AND ORDER

Before the Court is the Motion of Defendants Nolan Transportation Group, LLC ("NTG"), Mark Smith, and Lee Wasserman (collectively, "Defendants") for Summary Judgment ("Motion," Doc. 98).

### Background

### I.    Parties and Governing Agreements

On July 27, 2018, Steven A. Bell, as principal of Plaintiff Out of Nowhere ("OON"), entered into a Broker Carrier Agreement ("Agreement") with NTG related to furnishing contract carrier service for the transportation of goods,

property, freight, or general commodities. (Doc. 102 ¶ 1).[1] Mark Smith and Lee Wasserman are employees of NTG. (Doc. 1 ¶¶ 4, 5).

Through the Agreement, NTG agreed to solicit and arrange for transportation of freight from clients, and OON agreed to transport the freight. (Doc. 25-2 at 1). Each shipment under the Agreement is evidenced by a separate bill of lading containing the job's terms. (*Id.* ¶ 5). As a third-party broker, NTG has no direct control over a job's terms. (Doc. 102 ¶ 24). Changes and delays are common in the trucking industry. (*Id.* ¶ 25).

With respect to billing and payment, Paragraph 2 of the Agreement states:

> NTG will collect all Freight Charges from the Client on all Freight transported by CARRIER. Payment by the applicable Client to NTG is a condition precedent to NTG's payment to CARRIER for Freight Charges. . . CARRIER will be responsible for all costs and expenses associated with concessions or credits due to CARRIER'S actions or negligence and NTG will have the right to offset any payable owed to CARRIER.

(Id. ¶ 2). With respect to communicating with Clients, the Agreement states:

> PROHIBITED COMMUNICATIONS WITH NTG CUSTOMERS.

---

[1] The following facts are drawn from the parties' respective Statements of Material Facts. Citation to the relevant responsive statement without explanation or clarification indicates the Court has deemed the underlying statement admitted. For clarity and ease of reading, the Court omits quotation marks from admitted statements that are reproduced in this Order. Record citations are to the internal pagination, rather than the ECF header stamps, unless indicated otherwise.

> During the term of this Agreement and for a period of two (2) years after its termination for any reason, CARRIER covenants that, without the express written consent of and participation with NTG, CARRIER, its agents, contractors, employees or affiliates, or anyone directly or indirectly associated with CARRIER, or any under its control shall not directly, directly or indirectly, solicit, "back-solicit," contact, communicate with or induce, or attempt to solicit, contact, communicate with or induce, any NTG Client for the purpose of (i) transporting Freight or traffic or any property, (ii) selling any product or service competitive or potentially competitive with NTG, or (iii) terminating or adversely changing in any way such Client's relationship with NTG. If CARRIER breaches this Agreement and solicits, "back-solicits", contacts, communicates with, induces or transports Freight, property, traffic or business from any NTG Client, then NTG shall be entitled, for a period of three (3) years from the date of the violation, to a commission from CARRIER in the amount of fifteen percent (15%) of the gross charge on any such shipment for said Client(s).

(*Id.* ¶ 3).

## II.    The August 2021 Incident

On August 2, 2021, Vector Global Logistics (NTG's client) contacted NTG and requested assistance in securing a carrier to transport a load to Extra Space Storage in Las Vegas. (*Id.* ¶ 4). On August 16, 2021, Vector Global Logistics ("Vector") informed NTG that delivery of the load was set for Friday August 20th at noon. (*Id.* ¶ 6). Thereafter, Vector provided the pickup date. (*Id.* ¶ 7). Mr. Bell responded to a posting on NTG's website for the subject load, purportedly weighing 20,000 pounds, and a Carrier Rate Confirmation was issued. (*Id.* ¶ 8; Doc.

100 ¶ 1). At the time, Mr. Bell inquired about the time of delivery, because he would not book the job unless it provided adequate time to book a load back to Los Angeles. (Doc. 100 ¶ 2). Mr. Bell, on behalf of OON, booked the job with NTG from Los Angeles to Las Vegas on the understanding that the time of delivery would not be in the afternoon because Mr. Bell and OON already had a load scheduled on August 20, 2021 from Las Vegas to Los Angeles. (*Id.* ¶ 3).

On August 17, 2021, NTG informed Vector that the load had been assigned to Mr. Bell/OON. (Doc. 102 ¶ 9). That same day, Vector once again confirmed the cargo pickup and delivery dates with NTG, reflecting that delivery would be on "Friday 08/20 @ Noon." (*Id.* ¶ 10). However, at 10:45 a.m. Eastern Time,[2] NTG received notice from its client that the delivery time changed to 3:00PM, prior to Mr. Bell's truck being loaded at the shipper. (Doc. 98-3 at Def. Prod. 00017).

Meanwhile, Mr. Bell arrived at the shipper around 8:00 a.m. Pacific Time (11:00 Eastern Time). (Doc. 100 ¶ 5). While Mr. Bell was in the process of picking up the load on August 19th, he identified a discrepancy between the weight provided by NTG and the actual weight of the cargo. (Doc. 102 ¶ 11). Specifically, Mr. Bell noticed the gauge of his truck indicated that the load was much heavier than 20,000 pounds and emailed an NTG Carrier Sales Representative at 8:09 a.m.

---

[2] The Court assumes that the emails in question are in Eastern Time, as NTG's emails are signed with a Charleston, SC address and the Vector emails are signed with an Atlanta, GA address.

4

Pacific Time (11:09 a.m. Eastern Time) requesting a call due to the weight issue, stating, "[i]t is not 20000 lbs[,] it's more like 40000." (Doc. 100 ¶ 7).

The parties dispute the extent to which Plaintiffs had any other options at this point but to proceed with the load anyway, but a new Second Carrier Rate Confirmation was issued which included a $200.00 overweight charge. (*Id.* ¶¶ 9–11; Doc. 102 ¶ 12). The Second Carrier Rate Confirmation still indicated a delivery time of 12:00 p.m. (Doc. 1-3).

While Mr. Bell was in route to Las Vegas, he contacted Vector using a phone number found on the bill of lading and was told the delivery time was 3:00 pm Pacific Time. (*Id.* ¶ 14). When Mr. Bell attempted to deliver the freight in Las Vegas at approximately 11:00 a.m. Pacific Time on August 20th, the receiving facility was not ready for him. (*Id.* ¶ 15). Scott Webb, a third-party who had been retained to remove the freight from Mr. Bell's truck using a tow truck, rushed to the receiving facility and arrived at approximately 12:30 p.m. (*Id.* ¶ 16). Mr. Webb told Mr. Bell that he was never scheduled to unload at 12:00 p.m., but at 3:00 p.m. (Doc. 100 ¶ 21).

While Mr. Bell and Mr. Webb waited for the tow truck to arrive, Mr. Bell gave NTG the "ultimatum" of taking the freight back to the shipper. (Doc. 102 ¶ 17). Mr. Bell demanded additional compensation from NTG, writing at 3:36 p.m. Eastern/12:26 p.m. Pacific time, "2500 and I may stay". (*Id.* ¶ 18).

5

Multiple NTG employees asked Mr. Bell not to leave while agreeing to compensate him for his detention (waiting time) at the facility. (*Id.* ¶ 19). Ultimately, after much delay, NTG advanced Mr. Bell $1,100 and told to "go cash the com check and deliver the freight." (*Id.* ¶ 20; Doc. 100 ¶ 24[3]).

Following this incident, Mr. Bell repeatedly contacted NTG, Vector, and Extra Space Storage (the receiver). (Doc. 102 ¶ 21). Mr. Bell delivered the freight and sent a photo confirming the delivery to NTG Employee Mark Smith. (Doc. 100 ¶ 25). Mr. Smith responded, "[t]hanks Steve for working with us. Send the POD over in email and we will process the other half of the payment." (*Id.* ¶ 26). Mr. Bell attempted to follow up with Mr. Smith regarding his promise to "process the other half of the payment" but was sent a cease-and-desist letter by Defendant Wasserman on or about August 23, 2021. (*Id.* ¶ 27).

On Saturday, August 21, 2024, Mr. Bell emailed NTG about the damage to his truck as a result of the oversized load. (*Id.* ¶ 28). On Monday, August 23, 2024 at 8:27 a.m., Mr. Wasserman responded that NTG does not handle "liability claims" so Plaintiffs should take it up with who damaged the truck and that he would be filing a FreightGuard report "out of, you know, principal." (*Id.* ¶ 29). In

---

[3] Defendants' objection to Plaintiffs' Statement of Additional Material Facts ¶ 24 is overruled. A response to a statement of fact should either admit or deny the fact, not attempt to expound on or contextualize the fact; that is the purpose of the party's own statement of facts.

response to Plaintiffs' attempts to reach out and "take it up with who damaged the truck," Lee Wasserman reached out to Plaintiffs again, the same day at 3:36 p.m., saying "[i]f you agree to never again contact NTG or any of our customers, shippers or receivers ever again I will put this report down now and we can all move on." (*Id.* ¶ 30).

On August 24, 2021, at 7:16 a.m., Plaintiffs received an email from Christian Dutton, NTG senior account manager, stating that ". . . the remaining $1100 will be paid out within 30 days that is standard." (*Id.* ¶ 31).

On August 24, 2021 at 9:04 a.m., Christian Dutton, NTG senior account manager" sent an invoice to Vector that reflected a 100% "Customer Discount" and an email stating "Please note that the entire amount of $2400 is being removed for the many issues our driver cause during and after this delivery…" (*Id.* ¶ 32). Citing the Agreement, NTG, in turn, did not submit any further payment to Plaintiffs. (Doc. 102 ¶ 23).

## III.    FreightGuard Posts

Defendants posted two reports on FreightGuard regarding the incident: one on August 23, 2021, and one on October 7, 2021. (Doc. 1 ¶¶ 29, 34). The August 23, 2021 post stated:

> Steve Bell arrived onsite at the receiver and was told the equipment was not there to get him unloaded. They were running behind and we paid carrier $800 in detention to sit and wait about 3 hours. Steve decided he would take

7

> the load back to the shipper if we did not pay him for the
> load upfront, and his reason was it was 'out of principle'.
> Then Steve began talking to the customer and made the
> whole situation worse.

(Doc. 1-15). This post was later taken down after Plaintiffs retained counsel who

sent a cease-and-desist letter. (Doc. 1 ¶¶ 32–33). The October 7, 2021 post stated:

> Steve Bell took a load that required a crane to unload.
> When carrier arrived at the receiver, the crane was held
> up at the first job and the carrier was informed it would
> be 3 hours before the crane arrived. He was paid $800 for
> 3 hours and then he took the freight to a local 7/11 and
> held it hostage until we paid him half the line haul
> upfront, then he harassed our employers nonstop via
> phone, email, and text. All of which we have evidence of.

(Doc. 1-16).

### Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." A factual

dispute is genuine if the evidence would allow a reasonable jury to find for the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is

"material" if it is "a legal element of the claim under the applicable substantive

law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d

642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

## Discussion

Following the Court's Order of June 5, 2023 (Doc. 80), ten claims from Plaintiffs' Complaint remain pending: Breach of Contract (Count I), Account Stated (Count II), Open Book Account (Count III), Unjust Enrichment (Count IV), Fraudulent Misrepresentation (Count V), Negligent Misrepresentation (Count VI), Libel (Count VII), Libel Per Se (Count VIII), Violation of California Business & Professional Code § 17200 (Count XI), and Violation of 49 USC §14103(b) (Count XII). Defendants seek summary judgment on all outstanding counts.[4]

## I.     Contract Claims

Counts I to III essentially all seek identical relief: payment of all amounts allegedly due Plaintiffs from the August 2021 job. Defendants argue that, under the Agreement, payment to Plaintiffs is contingent on the condition precedent of payment by Vector, pointing to this portion of Paragraph 2 of the Agreement:

> Payment by the applicable Client to NTG is a condition precedent to NTG's payment to CARRIER for Freight Charges. . . CARRIER will be responsible for all costs and expenses associated with concessions or credits due to CARRIER'S actions or negligence and NTG will have the right to offset any payable owed to CARRIER.

---

[4] Plaintiffs did not file a response to Defendants' arguments regarding Unjust Enrichment (Count IV) and California Business & Professional Code § 17200 (Count XI). The Court has reviewed Defendants' brief and finds that judgment on these claims is appropriate for the reasons Defendants gave on pages 8 and 20–21 of their brief in support of the Motion. (Doc. 98-1).

(Doc. 25-2 ¶ 2). Because payment by Vector did not occur, they argue, there is no obligation under the Agreement to pay Plaintiffs. (Doc. 98-1 at 7–8). In response, Plaintiffs contend there is a fact dispute about whether payment by Vector to NTG was caused by NTG's own actions, rather than the actions of Plaintiffs. (Doc. 99-1 at 10) ("The Defendants waived payment by the applicable Client without record evidence that Client refused to make payment."). Plaintiffs are correct.

Under Georgia law, "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." O.C.G.A. § 13-4-23. Georgia courts have extended this principle to conditions precedent, noting that a jury question can exist where "nonsatisfaction of the condition precedent . . . [is] the result of [a party's] failure to exercise good faith," because "[w]here a defendant prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have resulted from the non-performance of such condition." *Merritt v. State Farm Mut. Auto. Ins. Co.*, 544 S.E.2d 180, 185 (Ga. Ct. App. 2000) (quoting *Oxford Motors Co. v. Niblack*, 360 S.E.2d 23 (Ga. Ct. App. 1987)); *see also Ga. 20 Props. LLC v. Tanner*, 564 S.E.2d 459, 462 (Ga. Ct. App. 2002) ("A party cannot avoid the obligations of a contract by frustrating the performance of a condition precedent.").

For example, in *Hammond v. Bank of Newnan*, 456 S.E.2d 678, 678 (Ga. Ct. App. 1995), a bank president signed an employment agreement providing for stock options. The president attempted to exercise the option, and the bank's board of directors approved the action, but the shares were not delivered. *Id.* at 678–79. When the bank president sued, the bank obtained summary judgment before the trial court on the grounds that "a condition precedent to . . . [the president's] exercise of the option, the approval by the Bank's shareholders and the State Department of Banking, had never been fulfilled." *Id.* at 679. On appeal, the bank president contended that if there was a failure of a condition precedent to seek shareholder and state approval of the options, the "failure was attributable to the Bank," and that "because the Bank failed to take the steps necessary to effectuate the statute's requirements after promising to do so, it cannot now rely on the failure of a condition precedent that it caused." *Id.* The Georgia Court of Appeals reversed the grant of summary judgment, holding that "[b]ecause there was conflicting evidence as to . . . whether it was [the president] or the Bank who prevented the performance of a condition precedent, . . . issues of fact remain for the jury." *Id.* at 680.

*Hammond* is analogous to this case. The Agreement here provides that "NTG will collect all Freight Charges from the Client on all Freight transported by CARRIER." (Doc. 25-2 ¶ 2). However, despite this promise to collect freight

charges, Plaintiffs argue that the record shows NTG unilaterally waived payment by Vector, causing the nonperformance of the condition precedent. (Doc. 99-1 at 7). In response, Defendants contend that "record evidence establishes that NTG did not seek payment from Vector in an effort to preserve its relationship with Vector following Vector's frustrations with Plaintiffs' actions." (Doc. 101 at 3). But this only creates a fact dispute as to whether the condition precedent would have occurred regardless of NTG's actions.[5] Accordingly, summary judgment on these counts is denied.

## II. Misrepresentation

The Court next considers Plaintiffs' claims for fraudulent and negligent misrepresentation together. The Eleventh Circuit has set forth the elements for each of these claims under Georgia law as follows:

> In order to establish these two claims, a plaintiff must show five elements: (1) that false representations were made; (2) that the defendant knew they were false; (3) that the representations were made either intentionally or negligently; (4) that the plaintiff reasonably relied

---

[5] The Parties also discuss the Agreement's provision barring Plaintiffs from communicating with clients directly, but Defendants do not make any argument regarding the operation of the provision on any obligation to Plaintiffs in their opening brief, and the Court will not consider for the first time any argument made in a reply brief. *Carter v. Howard*, No. 1:20-CV-1674-TWT-JSA, 2020 WL 10050792, at *1 (N.D. Ga. Oct. 22, 2020) (citing *Herring v. Sec'y, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005)); (*See* Doc. 101 at 5) ("Likewise, regardless of whether Plaintiffs attempted to solicit Vector's business from NTG, it cannot be reasonably disputed that Plaintiffs 'adversely chang[ed] in any way such Client's relationship with NTG' as prohibited by the Communications Clause.").

13

upon the representations; and (5) that harm proximately resulted from that reliance.

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1250 (11th Cir. 2007) (citing *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997) (fraud); *MacIntyre & Edwards, Inc. v. Rich*, 599 S.E.2d 15, 19 n. 14 (Ga. Ct. App. 2004) (negligent misrepresentation)).

Plaintiffs point to the allegedly false representations that the Vector load weighed 20,000 lbs. and was scheduled for delivery in Las Vegas, NV, at 12:00 p.m. Pacific Time when in truth the load weighed a total of 40,000 lbs. and was not scheduled for delivery until 3:00 p.m. While both of these representations were false, there is no evidence that at any point prior to the loading that Defendants knew about the weight of the load. Instead the record appears to show that all parties learned about that discrepancy at the same time.

On the other hand, there is evidence that Defendants knew that the delivery time was false when they issued the Second Carrier Confirmation. At 10:45 a.m. Eastern Time, NTG received notice from its client that the delivery time changed to 3:00 p.m. (Doc. 98-3 at Def. Prod. 00017). Meanwhile, Mr. Bell emailed an NTG Carrier Sales Representative at 11:09 a.m. Eastern Time requesting a call due to the weight issue, more than 20 minutes later. (Doc. 100 ¶ 7). The Second Carrier Rate Confirmation, issued after NTG learned of the delivery time change, still indicated a delivery time of 12:00 p.m. (Doc. 1-3). And it is stipulated for the purpose of

summary judgment that Mr. Bell would not book the job unless it provided adequate time to book a load back to Los Angeles, making such misrepresentation material. (Doc. 100 ¶ 2).

Whether the misrepresentations were made negligently or intentionally is a jury issue. As to fraudulent intent, Defendants argue that Plaintiffs cannot meet the "high standard of intent" to claim fraud. (Doc. 101 at 6). To establish intent, Plaintiffs essentially point to the sequence of events constituting circumstantial evidence:

> Because the Defendants knew of the 3:00PM delivery time prior to the start of loading for Plaintiffs, and knew that but-for this misrepresented delivery time the Plaintiffs would not have accept the load, a reasonable jury could find that Defendant knowingly and intentionally conveyed material elements of the contract in order to induce Plaintiffs to transport the subject load.

(Doc. 99-1 at 12).

Circumstantial evidence is often sufficient to create a fact dispute on fraudulent intent. O.C.G.A. § 23-2-57 ("Fraud may not be presumed but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence."). Indeed, "[p]roof of fraud is seldom if ever susceptible of direct proof, thus recourse to circumstantial evidence usually is required. Moreover, it is peculiarly the province of the jury to pass on these circumstances showing fraud." *Brown v. Mann*, 514 S.E.2d 922, 924 (Ga. Ct. App. 1999) (quoting *Lloyd v. Kramer*,

503 S.E.2d 632 (Ga. Ct. App. 1998)). Therefore, Georgia courts routinely hold that "[e]xcept in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination." *Id.*

Similarly, a jury question remains on whether the misrepresentation was negligent:

> [O]ne who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used.

*Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 300 S.E.2d 503, 504 (Ga. 1983). "[T]he negligence of the defendant and the plaintiff . . . are generally not susceptible of summary adjudication." *Robinson v. Kroger Co.*, 493 S.E.2d 403, 414 (Ga. 1997).

Defendants assert summary judgment is required anyway for three reasons. First, they argue that Plaintiffs cannot show reasonable reliance, because Mr. Bell learned about the delayed delivery time while en route but still completed the job (Doc. 102 ¶ 14), and in any case there is no dispute that changes and delays are common in the trucking industry. (*Id.* ¶ 25). But the record is unclear at what point Mr. Bell learned about the changed delivery time and whether not completing the job was even feasible anymore, and "[i]ssues of justifiable reliance and proper due diligence are generally for the jury[.]" *Saks Mgmt. & Assocs., LLC v. Sung Gen.*

*Contracting, Inc.*, 849 S.E.2d 19, 27–28 (Ga. Ct. App. 2020) (quoting *Nw. Plaza, LLC v. Ne. Enters.*, 699 S.E.2d 410 (Ga. Ct. App. 2010)).

Second, Defendants argue that Plaintiffs are improperly seeking to repackage a contract claim as a tort claim. (Doc. 98-1 at 9 n.10). But "[t]he fact that [Plaintiffs'] damages sought on [their] fraud, negligent misrepresentation, and breach-of-contract claims overlap with one another is not fatal to [their] tort claims at the summary judgment stage of the proceedings." *Wanna v. Navicent Health, Inc.*, 850 S.E.2d 191, 206 (Ga. Ct. App. 2020). While "[g]enerally, a mere breach of a valid contract amounting to no more than a failure to perform in accordance with its terms does not constitute a tort" outside of a confidential relationship, *Thomas v. Phoenix Mut. Life Ins. Co.*, 236 S.E.2d 510, 511 (Ga. Ct. App. 1977), Plaintiffs do not allege a mere breach of contract—they allege an affirmative, written misrepresentation in the contract. *Hill v. Century 21 Max Stancil Realty, Inc.*, 371 S.E.2d 217, 218 (Ga. Ct. App. 1988) ("[O]ne may justifiably rely upon representations of even those who are not in fiduciary relationships with them. A fiduciary relationship is not an element of fraud but merely gives a special basis for reliance.") (citing *Day v. Randolph*, 283 S.E.2d 687 (Ga. Ct. App. 1981)). And the fact that Plaintiffs are seeking economic damages in tort alongside in contract does not bar their claims because the misrepresentation exception to the economic loss

doctrine applies to claims for fraudulent and negligent misrepresentation. *Holloman v. D.R. Horton, Inc.*, 524 S.E.2d 790, 796 (Ga. Ct. App. 1999).

Finally, Defendants argue belatedly in a footnote in reply that accord and satisfaction bars claims for load weight or delivery time, (Doc. 101 at 6 n.2) but accord and satisfaction is an affirmative defense for which Defendants bear the burden of showing "(1) a previous valid obligation, (2) the agreement of the parties to [the] new contract, (3) a mutual intention by the parties to substitute the new contract for the old one, and (4) the validity of the new contract." *Stewart v. Johnson*, 605 S.E.2d 111, 113 (Ga. Ct. App. 2004) (quoting *Abrams v. Massell*, 586 S.E.2d 435 (Ga. Ct. App. 2003)). As the Court noted above, it will not consider a new argument raised in reply. *Carter v. Howard*, No. 1:20-CV-1674-TWT-JSA, 2020 WL 10050792, at *1 (N.D. Ga. Oct. 22, 2020). Moreover, a party with the burden of proof at trial cannot discharge its burden on summary judgment with cursory legal citations. "When the *moving* party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in the State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).

Summary judgment is thus inappropriate on the fraudulent and negligent misrepresentation claims.

## III.  Defamation

Next, the Court considers Plaintiffs' claims for libel arising from the two FreightGuard posts. "Under Georgia law, a 'libel is a *false* defamation of another and if what is printed is true there is no libel.'" *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1155 (11th Cir. 2011) (quoting *Savannah News–Press, Inc. v. Harley*, 111 S.E.2d 259, 261 (Ga. Ct. App. 1959) and citing O.C.G.A. § 51–5–1(a)). "A cause of action for libel will therefore fail if the statements at issue are shown to be truthful." *Id.* (citing *McCall v. Couture*, 666 S.E.2d 637, 639–40 (Ga. Ct. App. 2008) and O.C.G.A. § 51–5–6.) "'[T]ruthfulness is normally a question of fact for the jury,' . . . but where 'undisputed evidence of record shows that no genuine issue of material fact remains as to [the] truth of the allegedly defamatory communications,' the question of whether the 'communications were true and would, therefore, afford . . . no basis for a recovery' is one of law for the court to decide." *Id.* (quoting *Kersey v. U.S. Shoe Corp.*, 440 S.E.2d 250, 252 (Ga. Ct. App. 1994); *Yandle v. Mitchell Motors, Inc.*, 404 S.E.2d 313, 315 (Ga. Ct. App. 1991); *Jim Walter Homes v. Strickland*, 363 S.E.2d 834, 836 (Ga. Ct. App. 1987)).

To determine whether a material dispute of fact exists as to the truth of the FreightGuard posts, the Court compares the posts to the undisputed facts as

follows. Shaded statements indicate no corresponding fact or a contradictory undisputed fact.

| August 23, 2023 FreightGuard Post | Undisputed Fact |
|---|---|
| Steve Bell arrived onsite at the receiver and was told the equipment was not there to get him unloaded. | When Mr. Bell attempted to deliver the freight in Las Vegas at approximately 11:00 a.m. Pacific Time on August 20th, the receiving facility was not ready for him. (Doc. 102 ¶ 15). |
| They were running behind . . . | Mr. Webb told Mr. Bell that he was never scheduled to unload at 12:00 p.m., rather at 3:00 p.m. (Doc. 100 ¶ 21) |
| . . . and we paid carrier $800 in detention to sit and wait about 3 hours. | Multiple NTG employees asked Mr. Bell not to leave while agreeing to compensate him for his detention (waiting time) at the facility. (Doc. 102 ¶ 19; *see also* Doc. 1-9). |
| Steve decided he would take the load back to the shipper if we did not pay him for the load upfront, and his reason was it was 'out of principle'. | While Mr. Bell and Mr. Webb waited for the tow truck to arrive, Mr. Bell gave NTG the "ultimatum" of taking the freight back to the shipper. (Doc. 102 ¶ 17). Mr. Bell demanded additional compensation from NTG, writing at 3:36 p.m. Eastern/12:26 p.m. Pacific time, "2500 and I may stay". (*Id.* ¶ 18). |
| Then Steve began talking to the customer and made the whole situation worse. | Following this incident, Mr. Bell repeatedly contacted NTG, Vector (NTG's client), and Extra Space Storage (the receiver). (Doc. 102 ¶ 21). |

| October 2021 FreightGuard Post | Undisputed Fact |
|---|---|
| Steve Bell took a load that required a crane to unload. | N/A |
| When carrier arrived at the receiver, the crane was held up at the first job and the carrier was informed it would be 3 hours before the crane arrived. | Mr. Webb told Mr. Bell that he was never scheduled to unload at 12:00 p.m., rather at 3:00 p.m. (Doc. 100 ¶ 21). |
| He was paid $800 for 3 hours. . . | Multiple NTG employees asked Mr. Bell not to leave while agreeing to compensate him for his detention (waiting time) at the facility. (Doc. 102 ¶ 19; *see also* Doc. 1-9). |
| and then he took the freight to a local 7/11 . . . | N/A[6] |
| and held it hostage until we paid him half the line haul upfront, | Ultimately, NTG advanced Mr. Bell $1,100 . . . (Doc. 102 ¶ 20). |
| then he harassed our employees nonstop via phone, email, and text. All of which we have evidence of. | Following this incident, Mr. Bell repeatedly contacted NTG, Vector (NTG's client), and Extra Space Storage (the receiver). (Doc. 102 ¶ 21). |

Plaintiffs' primary argument is that the statement in the August 23, 2023 FreightGuard Post that the receiver was "running behind," and in the October 2021 FreightGuard Post that "the crane was held up at the first job and the carrier

---

[6] Defendants omitted any discussion about this fact in their statement of material facts, but do discuss it in their brief. (Doc. 98-1 at 18). *But see* LR 56.1(B) ("The Court will not consider any fact . . . set out only in the brief and not in the movant's statement of undisputed facts."). Nonetheless, Plaintiffs do not appear to argue that any inaccuracy in this statement was material.

was informed it would be 3 hours before the crane arrived" are each false. These statements imply that the receiver or lumper was running late when in actuality, they were never scheduled to arrive despite the terms of the job agreed to. Plaintiff's secondary argument is that the statement in the October 2021 FreightGuard Post that Mr. Bell "held [the freight] hostage" falsely implied a criminal act and moreover ignores the fact that he was unable to deliver the freight when he arrived.

Defendants argue that any inaccuracies in these statements do not render the posts as a whole substantially false, arguing that "'minor factual errors which do not go to the substance, the gist, the sting of [a] story' do not render a communication false for defamation purposes." (Doc. 101 at 8) (quoting *Jaillett v. Ga. Television Co.*, 520 S.E.2d 721, 724 (Ga. Ct. App. 1999) (quoting *Stange v. Cox Enters.*, 440 S.E.2d 503 (Ga. Ct. App. 1994))). As the Georgia Court of Appeals explained in *Jaillett*, a failure of a publication to tell the "whole truth" does not render the publication "substantially false." 520 S.E.2d at 725. "As long as facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth." *Id.* (quoting *Blomberg v. Cox Enters., Inc.*, 491 S.E.2d 430, 432 (Ga. Ct. App. 1997)).

22

The Georgia Court of Appeals considered similar circumstances to this case in *Bird v. Weis Broad. Corp.*, 388 S.E.2d 710, 711 (Ga. Ct. App. 1989). There, a disc jockey played a song he wrote about tow trucks which included the following lyrics:

> "[I]t's like havin' a license to rob." "[I]f these guys weren't towing cars, they'd be politicans [sic]." "[T]hey so bad they even make my preacher want to cuss." "[I]t really wouldn't anger me, I wouldn't have much to say, if only my car hadn't been parked in my driveway." At the end of the song the singer shouted over the closing music: "Hey, you can't do that . . . that's against the law, that's breaking the law."

*Id.* at 711. The tow company mentioned in the song admitted that "his business had towed cars from the locations mentioned in the song and that he charged the stated amount of money," and therefore the court upheld judgment against the tow company "[b]ecause the facts contained in the song were substantially true." *Id.* "The remaining content of the song," the court held, "was merely an expression of opinion about the practices and motivation of individuals involved in the automobile towing business, 'matters with respect to which reasonable men might entertain differing opinions' and is therefore not libelous." *Id.* (quoting *Bergen v. Martindale-Hubbell, Inc.*, 337 S.E.2d 770 (Ga. Ct. App. 1985)).

Here, the substance of the publication is that Mr. Bell communicated directly with a broker's customer and threatened to take the load back if not paid up front; misstatements about whether the receiver was running behind or was in fact never

scheduled to be there only go to Mr. Bell's motivations for taking those actions. Any statement about holding the load "hostage" was likewise an expression of opinion about motivation. These do not render the postings substantially false where Mr. Bell admits to having taken the actions.

To be clear, the Court agrees with Mr. Bell that Defendants' postings give the false impression that the receiver just happened to be running late, when Defendants knew it would be late long before Mr. Bell arrived and neglected to inform Mr. Bell of that fact. The fact that Defendants minimized their role in inflaming tensions seems at odds with their attempts in this case to seize the moral high ground and Mr. Wasserman's statement that he was acting "out of, you know, principal[sic]." (Doc. 99-1 at ECF p. 44). But this obfuscation does not render the postings actionable libel. Summary judgment is therefore appropriate.

## IV.    ICC Termination Act of 1995

Lastly, Plaintiffs bring claims against Defendants under Section 103 of the ICC Termination Act of 1995 (the "Act"), codified as Subtitle IV, Part B of Title 49. The provision in question states, in relevant part:

> **(b) Coercion prohibited**.--It shall be unlawful to coerce or attempt to coerce any person providing transportation of property by motor vehicle for compensation in interstate commerce (whether or not such transportation is subject to jurisdiction under subchapter I of chapter 135) to load or unload any part of such property onto or from such vehicle or to employ or pay one or more

> persons to load or unload any part of such property onto
> or from such vehicle . . . .

49 U.S.C. § 14103(b).

Section 103 of the Act provides for both civil and criminal enforcement of its provisions, including § 14103(b). Specifically, 49 U.S.C. § 14905(a) provides for a civil penalty[7] of no more than $10,000 for anyone who "knowingly authorizes, consents to, or permits a violation of subsection . . . (b) of section 14103," and 49 U.S.C. § 14905(b) provides for a criminal fine or maximum sentence of 2 years for any person who "knowingly violates" section 14103(b). The Act also provides for civil enforcement, specifically providing that a "carrier or broker providing transportation or service subject to jurisdiction under chapter 135[8] is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." 49 U.S.C. § 14704(a)(2).

---

[7] Under 49 U.S.C.A. § 14914(a), the Surface Transportation Board is responsible for assessing civil penalties, which are paid to the United States.

[8] "The phrase 'jurisdiction under chapter 135' generally refers to the jurisdiction of the Secretary of the Department of Transportation and the Surface Transportation Board . . . over the interstate transportation by motor carrier and the procurement of that transportation." *Stehle v. Venture Logistics, LLC*, No. 3:19-CV-169, 2020 WL 127707, at *3 (S.D. Ohio Jan. 10, 2020) (quoting *Hegemann v. M & M Am., Inc.*, No. 2:18-cv-00064, 2018 WL 4502181, at *5 (D. Vt. Sept. 20, 2018), and 49 U.S.C. §§ 13102(1), (2)).

The Eighth Circuit, on several occasions, has extensively reviewed the legislative history of § 14103. *See Jessep v. Jacobson Transp. Co.*, 350 F.3d 739, 742 (8th Cir. 2003); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 865 (8th Cir. 2011). In *Jessep*, the Eighth Circuit explained that the statute concerns the division of labor between the carrier and broker as to loading and unloading, noting that "[t]he plain language of the statute does not prohibit all unloading of motor vehicles by drivers, only coerced unloading," and that "[r]elated statutes clarify that carriers and drivers are expected to enter into contractual agreements as to who will be responsible for unloading freight." 350 F.3d at 742 (citing 49 U.S.C. § 14102(b)). "Additionally," the court explained "the legislative history indicates section 14103 was meant to prohibit coercive and extortionate practices." *Id.* (citing H.R.Rep. No. 96–1069, at 30–31 (1980)).

Having reviewed those cases, and finding them persuasive, the Court interprets § 14103(b) to literally apply to the act of loading and unloading. There is no allegation in this case that Plaintiffs were compelled to personally load or unload the freight or to employ or pay any person to load or unload the freight. Instead, Plaintiffs allege that they were "coerced" to transport freight (which was loaded and unloaded according to the terms of the Agreement) on the false premises that the load was 20,000 lbs. and that delivery could occur at Friday

August, 2021 at noon. So, § 14103(b) is not on point and summary judgment is appropriate here, too.

## Conclusion

For the above reasons, summary judgment is denied for Plaintiffs' breach of contract claims and their fraudulent and negligent misrepresentation claims and granted as to all other claims. If the parties are interested in mediating this dispute, including with one of the district's magistrate judges, they should reach out to the Court's courtroom deputy promptly to obtain a stay of this matter. But if the parties wish to proceed with trial, they must submit a consolidated pretrial order by January 31, 2025.

It is **ORDERED** that the Motion for Summary Judgment (Doc. 98) is **GRANTED IN PART** as to all counts besides Counts I–III, V and VI.

**SO ORDERED** this 3rd day of January, 2025.

Victoria Marie Calvert
United States District Judge